Steven M. ST. HILAIRE, Plaintiff,

v.

MINCO PRODUCTS, INC., Defendant.

No. Civ.02–3636(RHK/AJB).

United States District Court,
D. Minnesota.

Oct. 21, 2003.

Elizabeth A. Cloutier, Cloutier Law Offices, P.A., Minneapolis, MN, for Plaintiff Steven M. St. Hilaire.

Joan M. Quade and Edward P. Sheu, Barna, Guzy & Steffen, Ltd., Coon Rapids, MN, for Defendant Minco Products, Inc.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

This matter comes before the Court on Defendant's Motion for Summary Judgment. Plaintiff Steven M. St. Hilaire ("St.Hilaire") has sued Defendant Minco Products, Inc. ("Minco") for various forms of disability discrimination, retaliation, hostile work environment, violation of the Family and Medical Leave Act, negligence, wrongful discharge, and breach of con-

tract. Defendant Minco asserts that it is entitled to summary judgment on the grounds that St. Hilaire cannot establish a prima facie case on any claim, his termination was for good cause, and he suffered no damages.[1] For the reasons set forth below, the Court will grant Defendant's Motion for Summary Judgment.

### Background

St. Hilaire worked for Minco from 1984 until his termination in August 2000. (Compl. ¶ 9.) Minco is a Minneapolis based manufacturing company which makes heaters, flex-circuits, and temperature sensors. (*Id.* ¶ 6; *see* Minco, "About Minco," *available at* http://www.minco.com/corpinfo.php); *see also* Fed.R.Evid. 201(b). St. Hilaire began his employment at Minco as a Technician 1, was promoted several times, and was a Technician 5 Supervisor when he was terminated. (St. Hilaire Aff. ¶ 6.) As a supervisor, St. Hilaire worked around many people and his responsibilities included scheduling, training, discipline, and preparing performance evaluations. (*Id.* ¶¶ 20, 22; St. Hilaire Dep. Tr. at 14–15, 51–52, 154–56; Quade Aff. Ex. DD (job description).) His promotions came despite reprimands for excessive absences, tardiness, obscene language, and rule violations. (Quade Aff. Ex. AA; St. Hilaire Dep. Tr. at 266–75.)

St. Hilaire suffers from Tourette's Syndrome, which causes him to involuntarily cross his eyes, make noises, wiggle fingers, jerk his head, and talk loudly. (St. Hilaire Aff. ¶ 3.) He informed his supervisors at Minco about his condition and handed out information on Tourette's Syndrome. (St. Hilaire Dep. Tr. at 179.) Minco responded by holding a meeting to educate his co-workers about Tourette's. (*Id.*) Some co-workers, however, accused him of lying, swore at him, and called him names. (St.

Hilaire Aff. ¶¶ 3–5.) In 1997, St. Hilaire filed a discrimination and harassment charge with the Minnesota Department of Human Rights, but the Department dismissed the charge after finding no probable cause. (*Id.* ¶ 7; Cloutier Aff. Ex. 26.) Despite the Department's dismissal, Minco reprimanded those alleged to have harassed St. Hilaire. (St. Hilaire Dep. Tr. at 119, 180–81.)

In the late 1990s, St. Hilaire was involved in two car accidents. In July 1997, he fractured his ankle and foot and took a leave of absence for foot surgery from July 17, 1997 to August 22, 1997. (St. Hilaire Aff. ¶ 9.) In May 1999, he severely injured his neck, back, and exacerbated his Tourette's Syndrome. (*Id.* ¶ 13.) His doctors determined that he was totally disabled and he took a leave of absence from May 17, 1999 to August 22, 1999. (*Id.*) From August 23, 1999 to December 10, 1999, his doctors determined that he was partially disabled and placed him on heavy lifting restrictions and limited the amount of time St. Hilaire could stand and walk. (*Id.* ¶ 14.) Minco made accommodations and abided by these restrictions, although St. Hilaire felt that Minco went "overboard" by making him record how long he was out of his chair. (St. Hilaire Dep. Tr. at 237–40.) Due to subsequent medical treatment and back surgery, however, his doctors again declared him totally disabled and unable to work from December 11, 1999 through August 2000. (St. Hilaire Aff. ¶ 15.) He was also found to be totally disabled and unable to work by the Social Security Administration from the May 17, 1999 accident through August 2000. (Cloutier Aff. Ex. 25.) As a result, he was entitled to Social Security disability insurance benefits. (*Id.*) From May 1999, the

---

1. Minco has also moved for Rule 11 sanctions. The Court will not address the Rule 11 motion at this time but will continue to hold it under advisement and retain jurisdiction over the attorneys.

month of the first accident, to his termination in August 2000, a period of sixteen months, St. Hilaire only worked sporadically.[2] (St. Hilaire Dep. Tr. at 54–56.)

St. Hilaire believed his leave from Minco came under the Family and Medical Leave Act.[3] (St. Hilaire Aff. ¶¶ 13, 15; St. Hilaire Dep. Tr. at 162.) In January 2000, Minco sent St. Hilaire a letter stating that it had received his request to remain off work for a minimum of six months after his February 2000 back surgery. He was advised that Minco could not keep his supervisor position available, but if he returned by August 18, 2000 he could work as an assembler. (Quade Aff. Ex. M.) The letter stated:

Dear Mr. St. Hilaire:

Thank you for keeping us informed concerning your medical leave of absence. We have received from you the Report of Workability that states that you must remain off work. You are scheduled for surgery on February 17, 2000. When you called this information in to Betty Bauer in ADS, you informed her that you applied for Social Security Disability Benefits and that you would be off work for a minimum of six months after your surgery.

We are unable to keep your group leader position available. That position, if left unfilled, will cause the department to be unable to function properly since certain group leader functions, like training and paperwork, are necessary for the group to operate efficiently. However, we will keep you on the payroll on an unpaid medical leave of absence until August 18, 2000 and return you to an assembler position with the group, at the same rate of pay you had been receiving, if you return within that time frame.

Please keep us informed of any changes in your medical leave status.

Yours very truly,

Mary Ann Broos

Human Resources Administrator

(Cloutier Aff. Ex. 15.) The letter was undated, but "Sent 1–11–2000" was written under the author's name. (*Id.*; Broos Aff. ¶ 3.) Ms. Broos says she sent the letter (Broos Aff. ¶ 3), but St. Hilaire claims that he never received it.[4] St. Hilaire did not return to work by August 18, 2000.

2. The following shows the number of days St. Hilaire worked, starting the month he was terminated and going back to the date of his first accident: August 2000(0), July 2000(0), June 2000(0), May 2000(0), April 2000(0), March 2000(0), February 2000(0), January 2000(0), December 1999 (6 full, 2 partial days), November 1999 (worked full days all month), October 1999 (3 full days), September 1999 (15 partial days), August 1999 (7 partial days), July 1999(0), June 1999(0), and May 1999 (2 full weeks). (St. Hilaire Dep. Tr. at 54–56.)

3. St. Hilaire took what he considered to be FMLA leave from May 17, 1999 to August 22, 1999 (St. Hilaire Aff. ¶ 13) and from December 11, 1999 through August 22, 2000. (*Id.* ¶ 15.) Overall, his total FMLA leave was approximately 45 weeks (his leave spanning May 17, 1999 to August 22, 1999 was in excess of 12 weeks, and his leave spanning December 11, 1999 to August 22, 2000 is in excess of 33 weeks). (*Id.*)

4. The parties dispute whether St. Hilaire actually received the January 11, 2000 letter. Conversations St. Hilaire had with Minco employees Jane Stoner and Mary Ann Broos and a letter St. Hilaire wrote to Minco, however, indicate that Minco did in fact send this letter and he received it. (Quade Aff. Ex. A (Letter From St. Hilaire to Minco); Cloutier Aff. Ex. 17 (phone conversations with Mary Ann Broos and Jane Stoner); Stoner Aff. ¶¶ 2–3; Broos Aff. ¶ 3.) On this evidence, the Minnesota Department of Human Rights found that Minco sent, and St. Hilaire received, the letter when it determined that St. Hilaire's discrimination claim lacked probable cause. (Cloutier Aff. Ex. 26 (Minnesota Department of Human Rights Decision).)

On August 28, 2000, St. Hilaire received a certified letter from Minco dated August 22, 2000 notifying him that he had been terminated for not returning to work on August 18, 2000. (St. Hilaire Aff. ¶ 18; Cloutier Aff. Ex. 14.) The termination letter stated:

Dear Mr. St. Hilaire,

It is our understanding that you were not able to return to work following the expiration of your most recent leave of absence on August 18, 2000. As you will recall, this six-month leave of absence was granted following your surgery and after your family and medical leave of absence expired. Therefore we regret to inform you that your employment with MINCO Products, Inc. was terminated effective August 21, 2000. In the event that you are able to work at some point in the future, you are invited to apply for any vacancies with our company at that time.

We wish you the best on your recovery. Information on your 401K and ESOP benefits will follow under separate cover.

Yours truly,

Mary Ann Broos

Human Resources Administrator

(Cloutier Aff. Ex. 14.) St. Hilaire repeatedly requested reinstatement, but was never hired back. (St. Hilaire Aff. ¶¶ 18, 19.)

St. Hilaire's doctors never cleared him to go back to work prior to August 2000. (St. Hilaire Dep. Tr. at 145–47.) It was St. Hilaire's Tourette's Syndrome that prevented him from working. (*Id.* at 199–

200.) After his termination, St. Hilaire told Minco what accommodations he needed for his Tourette's Syndrome in order to come back to work at Minco.[5] (*Id.* at 137–38, 233–34.) To accommodate his Tourette's Syndrome, St. Hilaire requested "isolat[ion] ... from other employees," "limited interaction with co-workers," and "a manufacturing job where I would not be in close proximity of people for fear of uncontrollable body movements such as dropping a tool, accidently striking someone, etc." (St. Hilaire Dep. Tr. at 47; St. Hilaire Aff. ¶ 21.) Minco was unwilling to provide the requested isolation accommodation and did not rehire St. Hilaire. (St. Hilaire Aff. ¶¶ 19, 21–22.) In 2001, St. Hilaire filed another disability discrimination charge with the Minnesota Department of Human Rights, but the Department dismissed his case after finding no probable cause. (Cloutier Aff. Ex. 26.) The dismissal was upheld on appeal. (*Id.*)

### Standard of Decision

A party is entitled to summary judgment if the evidence demonstrates that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). In viewing the evidence, the Court makes its inferences in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir.1996); *see also Adkison v. G.D. Searle & Co.,* 971 F.2d 132, 134 (8th Cir.1992). The burden is on the moving party, *Enterprise Bank,* 92 F.3d at 747; *Celotex Corp. v. Catrett,* 477 U.S. 317,

---

**5.** St. Hilaire contradicts himself on when he first requested accommodations for his Tourette's Syndrome. In one paragraph of his affidavit, St. Hilaire seems to claim that he made requests while employed at Minco (*see* St. Hilaire Aff. ¶¶ 3, 8), yet in other paragraphs, and in his deposition, he states that he did not. (St. Hilaire Aff. ¶ 21; St. Hilaire Dep. Tr. at 137–38, 234.) St. Hilaire cannot generate an issue of fact by filing affidavits that are internally inconsistent and inconsistent with his sworn deposition. *See Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1365–66 (8th Cir.1983) (holding that a party cannot create a "sham" issue of fact in an effort to defeat summary judgment by filing an affidavit directly contradicting prior deposition testimony); *Herring v. Canada Life Assur. Co.,* 207 F.3d 1026, 1030 (8th Cir.2000) (same).

322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and summary judgment should be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party, however, may not rest upon the allegations or denials of its pleadings. Rather, the nonmovant must establish the existence of specific facts that create a genuine issue for trial. Neither mere allegations nor denials are sufficient. *Id.* In essence, the court performs a threshold inquiry to determine whether there is need for trial. *Id.*

### Analysis

Minco moves for summary judgment on each count of St. Hilaire's six count Complaint. Counts One and Three allege disability discrimination, retaliation, and hostile work environment under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, Minnesota Human Rights Act ("MHRA"), Minn.Stat. § 363.01 *et seq.*, and the Minneapolis Civil Rights Ordinance ("MCRO"), Minneapolis, Minn., Code § 139 *et seq.*[6] (Compl.¶¶ 45–59, 65–78.) Count Two alleges a violation of, and retaliation for using, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* (*Id.* ¶¶ 60–64.) Count Five alleges negligent supervision/ retention and Count Six alleges wrongful discharge/breach of contract. (*Id.* ¶¶ 79–89.) The Court will address each claim in turn.

### I. ADA, MHRA, and MCRO Claims[7]

Under the ADA, MHRA, and MCRO, St. Hilaire has launched a fusillade of claims at Minco. St. Hilaire alleges that Minco discriminated against him because it failed to accommodate his disability (Pl.'s Mem. in Opp'n at 18–20), failed to enter into an interactive process to find reasonable accommodations (*id.* at 19), failed to reassign him to another position (*id.* at 17), improperly considered his disability as a "motivating factor" in his termination (*id.* at 22–25), permitted a hostile work environment and harassment (*id.* at 21–22), and retaliated against him (*id.* at 21). Minco responds that because St. Hilaire is not a "qualified individual" under the ADA, as he fails to show he can work "with reasonable accommodations" (Def.'s Mem. in Supp. at 18–23), it follows that Minco did not fail to accommodate (*id.*), did not fail to participate in an interactive process (*see id.*), and was not required to reassign St. Hilaire (*see id.*). In addition, Minco asserts that it did not consider his disability when it terminated his employment (Def.'s Reply Mem. in Supp. at 5–6), did not allow a hostile work environment, and did not retaliate (Def.'s Reply Mem. in Supp. at 2–3).

### A. Failure to Accommodate

■ St. Hilaire alleges that Minco discriminated against him because of his Tourette's Syndrome by failing to accommodate his disability. The ADA prohibits employers from discriminating against a qualified individual with a disability because of the disability. 42 U.S.C. § 12112(a); *Dropinski v. Douglas County*, 298 F.3d 704, 706 (8th Cir.2002). A "qualified individual" is an "individual with a disability who, with or without reasonable accommodations, can perform the

---

6. Count Four alleges "aiding and abetting" violations of the MHRA and MCRO.

7. The Court will assess the three claims together, as each is analyzed under the same standards. *See Philip v. Ford Motor Co.*, 328 F.3d 1020, 1023 n. 3 (8th Cir.2003) (citation omitted) (analyzing ADA and MHRA claims under the same standard); *Rasmussen v. Glass*, 498 N.W.2d 508, 511 (Minn.Ct.App. 1993) (finding that the MCRO is based on the MHRA).

essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Discrimination" includes not making reasonable accommodations for a qualified individual with a disability. *Id.* § 12112(b)(5); *Fenney v. Dakota, Minnesota & Eastern R.R. Co.*, 327 F.3d 707, 711 (8th Cir.2003). Therefore, to survive a motion for summary judgment and obtain relief under the ADA, St. Hilaire must establish a prima facie case of disability discrimination by demonstrating (1) he is disabled within the meaning of the ADA, (2) he was qualified to perform the essential functions his job, with or without reasonable accommodation, and (3) he suffered an adverse employment action because of his disability. *Philip*, 328 F.3d at 1023; *Burchett v. Target Corp.*, 340 F.3d 510, 516–17 (8th Cir. 2003); *Fenney*, 327 F.3d at 711.

Proceeding directly to the second element,[8] the issue is whether St. Hilaire has shown that he can perform the essential functions of his job with or without reasonable accommodations. "Reasonable accommodations" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position ... and training materials or policies." 42 U.S.C. § 12111(9)(B). Although there is no precise test for what constitutes a reasonable accommodation, "an accommodation is unreasonable if it either imposes undue financial or administrative burdens, or requires a fundamental alteration in the nature of the program." *Buckles v. First Data Resources, Inc.*, 176 F.3d 1098, 1101 (8th Cir.1999) (citation and internal quotations omitted).

St. Hilaire does not assert that he can perform the job without reasonable accommodations. (St. Hilaire Aff. ¶¶ 18, 21, 22, 29.) Rather, St. Hilaire asserts that he can perform his job with reasonable accommodations. In order to perform his job at Minco, St. Hilaire requests "isolat[ion] ... from other employees," "limited interaction with co-workers," and "a manufacturing job where I would not be in close proximity of people for fear of uncontrollable body movements such as dropping a tool, accidently striking someone, etc."[9] (St. Hilaire Dep. Tr. at 47; St. Hilaire Aff. ¶ 21.) Minco contends that isolation is not a reasonable accommodation.

■ The Court finds that St. Hilaire has not shown that he could perform the essential functions of his job with reasonable accommodations because isolation is not a reasonable accommodation. Although St. Hilaire argues that as a supervisor he had "limited interactions with people and in fact, most of the work is done on a computer" (St. Hilaire Aff. ¶ 22), he admits that being around others was an essential function of his job, (St. Hilaire Dep. Tr. at 156), and his job description describes his supervisory duties as scheduling, training, discipline, and evaluating performance. (Quade Aff. Ex. DD.) Given that working around others is essential to his job, St. Hilaire's requested isolation accommodation would clearly impose an undue financial and administrative burden on Minco. *See Buckles*, 176 F.3d at 1101. "An employer is not required by the ADA to create a wholly isolated work space for an employee that is free from" other co-

---

**8.** Minco does not dispute that St. Hilaire is disabled. (Def.'s Reply Mem. in Supp. at 4.)

**9.** St. Hilaire has not offered any evidence that he requested any other accommodations before or after his termination. While he baldly

asserts that "I asked for [accommodations] every time I seem to get in a lot of trouble because of [my Tourette's Syndrome symptoms]" (St. Hilaire Dep. Tr. at 233), he never explains what accommodations other than isolation he required.

workers. *Id.* (finding it an unreasonable accommodation to require employer to provide an isolated workplace free of irritants); *Gits v. Minnesota Min. and Mfg. Co.,* Civ. No. 99–1925 (ADM/AJB), 2001 WL 1409961, at *8 (D. Minn. June 15, 2001) (finding it unreasonable to require employer to create an isolated workplace free of chemicals). "In this situation, there is only so much avoidance that can be done before an employer would essentially be providing a bubble for an employee to work in," *Buckles,* 176 F.3d at 1101, but the ADA does not mandate the creation of a co-worker free bubble for St. Hilaire. *See Gits,* 2001 WL 1409961, at *8. Because St. Hilaire fails to advance a reasonable accommodation, he has not met his initial burden to show that he is a qualified individual under the ADA. Therefore, he has not established a prima facie case for disability discrimination.[10]

### B. Hostile Work Environment and Harassment

St. Hilaire also alleges that Minco is liable for creating or permitting a hostile work environment. The Eighth Circuit, however, has "never recognized an ADA ... claim based on a hostile work environment." *Jeseritz v. Potter,* 282 F.3d 542, 547 (8th Cir.2002) (citation and internal quotations omitted). Assuming, without deciding, that such a cause of action exists, it "would be modeled after the similar claim under Title VII." *Id.* (citation and internal quotations omitted). To make a prima facie case for hostile work environment, St. Hilaire must offer evidence of harassment that was "so severe or pervasive as to alter the conditions of [his] employment and create an abusive working environment." *Id.* (citation and internal quotations omitted). In analyzing such evidence, relevant considerations include, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "Accordingly, the ordinary tribulations of the workplace, such as the sporadic use of abusive language ... and occasional teasing are not actionable." *Wallin v. Minnesota Dept. of Corrections,* 153 F.3d 681, 688 (8th Cir.1998) (citations and internal quotations omitted).

St. Hilaire points to incidents of friction between himself and his co-workers. For example, his co-workers were skeptical of his Tourette's Syndrome, accused him of lying, and called him "strange," "weird," "retarded," "a baby," "immature," "a whiner," "a thorn in [a co-worker's] thigh," and "a pain in the ass." (St. Hilaire Aff. ¶ 4; *see also* Darrington Aff. ¶¶ 6, 7.) Minco responds that such conduct does not rise to the level of such severe and pervasive

---

**10.** It follows that St. Hilaire's other accommodation claims also fail. His interactive process claim is meritless because St. Hilaire cannot show that he "could have been reasonably accommodated but for [Minco's] lack of good faith," *Cravens v. Blue Cross & Blue Shield,* 214 F.3d 1011, 1021 (8th Cir.2000). Additionally, his failure to reassign claim fails because he cannot show that he was "seeking an existing position within the company" or that he was "otherwise 'qualified' for the reassignment position ... [meaning that he] be able to perform the essential functions of that position with or without reasonable accommodations." *Id.* at 1019. Furthermore, his claim that his disability was a motivating factor in Minco's decision to terminate him fails because he is not a "qualified individual with a disability" eligible for ADA protection, as he cannot perform his job with reasonable accommodations. 42 U.S.C. § 12111(8); *Fenney,* 327 F.3d at 711 ("[T]o obtain relief under the ADA, [St. Hilaire] must show that he ... is a 'qualified individual' under the ADA ...." (citation omitted)).

harassment as to create a hostile work environment. The Court agrees.

■ While his co-workers displayed incivility and poor judgment, St. Hilaire's allegations are, at most, an account of the unfortunate, yet ordinary tribulations of the modern workplace. The discrimination laws, however, "are not a general civility code" and "offhand comments [ ] and isolated incidents ... will not amount to discriminatory changes in the terms and conditions of employment." *Wallin,* 153 F.3d at 688 (citations and internal quotations omitted). Furthermore, the Court cannot find that his co-workers' conduct "unreasonably interfere[d] with [his] work performance," *Harris,* 510 U.S. at 23, 114 S.Ct. 367, given his admission that "[d]espite my disabilities and the negative treatment I received, I was promoted four times from Technician 2 to Technician 5 Supervisor from 1984 to 1999. I routinely received above average to excellent job performance evaluations." (St. Hilaire Aff. ¶ 6.) Therefore, even if the Eighth Circuit recognized a hostile work environment claim under the ADA, *Jeseritz,* 282 F.3d at 547, St. Hilaire could not establish a prima facie case. Accordingly, the Court will grant Minco's motion on the hostile work environment claim.

## C. Retaliation

■ St. Hilaire alleges that his termination was in retaliation for filing a discrimination charge in 1997 and for requesting disability accommodations. Under the ADA, employers are prohibited from retaliating against a person who files a charge of discrimination or requests an accommodation. *See* 42 U.S.C. § 12203(a); *Heisler v. Metro. Council,* 339 F.3d 622, 632 (8th Cir. 2003). Retaliation claims under the ADA are analyzed identically to those brought under Title VII. *Cossette v. Minnesota Power & Light,* 188 F.3d

964, 972 (8th Cir.1999). A prima facie case of retaliation consists of three elements: (1) protected activity, (2) adverse action taken by the employer against the employee, and (3) a causal link between the two. *Id.* (citation omitted).

St. Hilaire devotes little to the ADA retaliation claim, stating only that his August 2000 termination was in retaliation for (1) filing a discrimination charge with the Minnesota Department of Human Rights in 1997 and (2) demanding accommodations for his Tourette's Syndrome. Minco responds by asserting that (1) St. Hilaire cannot show a causal link between the discrimination charge and his termination and (2) Minco could not have retaliated against St. Hilaire for requesting accommodations for his Tourette's Syndrome because he admits that he did not make such requests until after his termination.

■ With regard to his retaliation claim for the 1997 discrimination charge, St. Hilaire has not established a causal link showing that Minco's allegedly retaliatory motive played a part in the adverse employment action. *Kipp v. Missouri Highway & Transp. Comm'n,* 280 F.3d 893, 896–97 (8th Cir.2002). The record shows that St. Hilaire was retained by Minco for three years after the discrimination charge and Minco took action by reprimanding the alleged harasser, even though the charge was dismissed. (St. Hilaire Dep. Tr. at 119, 180–81.) Other than showing that the termination occurred after the charge was filed, however, St. Hilaire has not pointed to any facts suggesting the required causal link. The three year interval, however, "so dilutes any inference of causation that [the Court is] constrained to hold as a matter of law that the temporal connection could not justify a finding in [St. Hilaire's] favor on the matter of causal link." *Kipp,* 280 F.3d at 897 (finding an interval of two months did not establish a

causal link). "The further in proximity the decision to terminate is from the protected activity, the less suspect the decision to terminate becomes." *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 774 (8th Cir.2003) (citation omitted).

■ With regard to his retaliation claim for requesting accommodations, St. Hilaire admits that he never requested any accommodations for his Tourette's Syndrome while employed at Minco.[11] (St. Hilaire Aff. ¶ 21; St. Hilaire Dep. Tr. at 137–38, 234.) Because a plaintiff must show that he engaged in ADA protected conduct prior to being terminated, *see Cossette*, 188 F.3d at 972, St. Hilaire cannot make a prima facie case for ADA retaliation. Accordingly, the Court will grant Minco's motion on the retaliation claims.

## II. FMLA Claims

Minco argues that St. Hilaire's FMLA violation claim must be dismissed because St. Hilaire was not entitled to have his job restored. It further argues that St. Hilaire's FMLA retaliation claim must also be dismissed because he cannot show a causal connection.

### A. FMLA Violation

St. Hilaire claims that Minco violated the FMLA when it did not restore him to his job. The FMLA provides eligible employees up to twelve workweeks of unpaid leave during any twelve-month period for an employee's serious health condition that makes him unable to perform the functions of his position. 29 U.S.C. § 2612(a)(1)(D); *Hatchett v. Philander Smith College*, 251 F.3d 670, 676 (8th Cir.2001). Upon return from FMLA leave, an employee is generally entitled to be restored to the position held prior to leave, or an equivalent position. 29 U.S.C. § 2614(a)(1); *Hatchett*, 251 F.3d at 677. An employee is not entitled to restoration, however, if, at the end of the FMLA leave period, the employee is still unable to perform an essential function of the position. 29 C.F.R. § 825.214; *Hatchett*, 251 F.3d at 677.

■ Minco argues, and the Court agrees, that St. Hilaire was not entitled to restoration. Assuming he was eligible for FMLA leave,[12] St. Hilaire's FMLA leave was exhausted before his August 2000 termination.[13] Thus, to be entitled to restoration, St. Hilaire would have to be able to perform the essential functions of his position at the time his leave ended. St. Hilaire, however, cannot show that he was able to perform the functions of his job. Under the FMLA regulations, being "unable to perform the functions of the position" is defined as (1) "where the health

---

11. Again, St. Hilaire contradicts himself on when he first asked for accommodations, *see supra* n. 5, but he cannot avoid summary judgment by raising issues of material fact through self-serving affidavits and memoranda that directly contradict his sworn deposition testimony without so much as an explanation for the contradictions. *See Herring*, 207 F.3d at 1030. Mere allegations that he did make such requests are insufficient to withstand summary judgment. *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505.

12. An eligible employee is one who has been employed for at least twelve months by the employer with respect to whom the leave is requested and for at least 1,250 hours of service with such employer during the previous twelve-month period. 29 U.S.C. § 2611(2). Minco asserted at oral argument that St. Hilaire was not eligible for FMLA leave, his FMLA leave was exhausted, and that his leave was simply gratuitous.

13. From May 17, 1999 to May 17, 2000, St. Hilaire took in excess of 32 weeks of leave (May 17, 1999 to August 22, 1999 and December 11, 1999 to May 17, 2000). (*See supra* n. 3.) From May 17, 2000 to August 22, 2000, when he was terminated, he took an additional 13+ weeks of leave. (*Id.*) Under the FMLA, however, St. Hilaire was only entitled to 12 workweeks of leave during any 12–month period. 29 U.S.C. § 2612(a)(1).

care provider finds that the employee is unable to work at all" or (2) when "the employee is unable to perform any one of the essential functions of the employee's position within the meaning of the [ADA]." 29 C.F.R. § 825.115. St. Hilaire fits both of these definitions. First, his doctors found that he was unable to work and they did not issue any notes allowing him to return to work. (St. Hilaire Dep. Tr. at 145–47.) Second, the Court has already found that St. Hilaire is unable to perform the essential functions of his position within the meaning of the ADA. *See supra* Part. I. Because "[t]he FMLA does not require an employer to allow an employee to stay in a position that the employee cannot perform," *Hatchett*, 251 F.3d at 677, the Court concludes that Minco did not violate the FMLA by not restoring St. Hilaire to his job.[14]

## B. FMLA Retaliation

■ St. Hilaire alleges that his termination was in retaliation for taking FMLA leave. To establish a prima facie claim for FMLA retaliation, an employee must show that (1) he engaged in activity protected under the Act, (2) he suffered an adverse employment action caused by the employer, and (3) that a causal connection existed between his action and the adverse employment action. *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 832 (8th Cir.

2002). If the employer comes forward with evidence of a legitimate, nondiscriminatory reason for its treatment of the employee, the employee must then point to some evidence that the employer's proffered reason is pretextual. *Id.* at 833. To carry the burden of showing pretext, the employee must show that the employer's justification was not believable. *Id.* at 833–34.

■ Minco contends that St. Hilaire cannot make a prima facie case for retaliation because he cannot show a causal connection. The Court agrees. The record shows that Minco provided St. Hilaire with long periods of medical leave throughout his career and continued to retain him on unpaid leave for at least eight months after he started taking his last medical leave.[15] Again, St. Hilaire cannot point to any facts, other than temporal proximity, that suggests his termination was motivated by retaliation for taking leave. The eight-month interval from when he last took leave to his termination, however, is too great to raise an inference of retaliation. *See Kipp*, 280 F.3d at 897. Accordingly, the Court will grant Minco's motion on the FMLA retaliation claim.[16]

## III. Negligent Supervision and Retention Claims

■ St. Hilaire alleges that Minco negligently supervised and retained employees

---

14. St. Hilaire's counterargument that he did not receive notice that his FMLA leave had expired does not save him. (St. Hilaire Aff. ¶ 15.) Even assuming that he did not receive the January 11, 2000 letter, it is undisputed that St. Hilaire's "serious health condition" continued after the end of his 12–week FMLA leave period. *See supra* n. 13. As such, "[a]ny lack of notice of the statutory 12–week limitation on FMLA leave could not rationally be found to have impeded [St. Hilaire's] return to work." *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 161–62 (2d Cir. 1999).

15. Assuming St. Hilaire began FMLA leave in December 1999, his termination came eight months later in August 2000.

16. If called upon to reach the issue, the Court would also determine that Minco has come forward with evidence of legitimate, nondiscriminatory reasons for firing him, i.e., St. Hilaire's leave had expired, but he did not return to work and could not perform the essential functions of his job if he had returned. St. Hilaire has not pointed to any evidence that creates a question of fact that this reason was pretextual. *Smith*, 302 F.3d at 833.

who discriminated against him. "To maintain an action for either negligent retention or negligent supervision, the existence of a threat, or reasonable apprehension of actual *physical injury* is required." *Cook v. Domino's Pizza, L.L.C.,* Civ. No. 01–500 (RHK/JMM), 2001 WL 821952, at *3 (D.Minn. July 17, 2001) (Kyle, J.) (emphasis added); *see Thompson v. Olsten Kimberly Quality–Care, Inc.,* 980 F.Supp., 1035, 1041 (D.Minn.1997); *Semrad v. Edina Realty, Inc.,* 493 N.W.2d 528, 534 (Minn.1992); *Bruchas v. Preventive Care, Inc.,* 553 N.W.2d 440, 443 (Minn.App.1996). St. Hilaire does not allege a physical injury or apprehension of physical injury and he does not present any facts suggesting such. Accordingly, the Court will grant Minco's motion on the negligent supervision and negligent retention claims.

## IV. Wrongful Discharge/Breach of Contract Claims

Finally, Minco asserts that St. Hilaire's wrongful discharge and breach of contract claims must be dismissed because the discharge was not wrongful and St. Hilaire suffered no damages even if his employment contract had been breached.

### A. Wrongful Discharge

St. Hilaire alleges that he was wrongfully discharged. The gravamen of St. Hilaire's claim is that Minco terminated him because of his disability. (Pl.'s Mem. in Opp'n at 29.) Because the Court has determined that St. Hilaire's disability discrimination and retaliation claims have no basis, his wrongful discharge claim must

also fail. Accordingly, the Court will grant Minco's motion on the wrongful discharge claim.

### B. Breach of Contract

St. Hilaire alleges that his termination was in breach of contract because Minco did not follow their termination procedures.[17] In employment cases, however, "the general rule is that the measure of damages for breach of an employment contract is the compensation which an employee who has been wrongfully discharged *would have received* had the contract been carried out according to its terms." *Feges v. Perkins Restaurants, Inc.,* 483 N.W.2d 701, 709 (Minn.1992) (citation and internal quotations omitted) (emphasis added); *see* 4 Minnesota Practice Series, CIVJIG 55.60 (4th ed.1999). Minco argues, and the Court agrees, that St. Hilaire cannot show that he suffered any damages as a result of his termination. The Court has already concluded that the accommodation St. Hilaire requests is unreasonable under the ADA and that he is not entitled to restoration under the FMLA. *See supra* Parts I & II. Therefore, St. Hilaire's inability to work leads the Court to conclude that there was no compensation that St. Hilaire "would have received had the contract had been carried out according to its terms." *Feges,* 483 N.W.2d at 709 (citations and internal quotations omitted). Consequently, he suffered no damages by being terminated. Because St. Hilaire cannot prove damages, an essential element of his breach of contract claim, the Court will grant Minco's motion.[18]

17. Under Minnesota law, employees, with some exceptions, are considered at-will and can be terminated at any time, with or without cause. *James v. Western Nat'l. Mut. Ins. Co.,* Civ. No. 99–1566 (RHK/JMM), 2001 WL 436121, at *11 (D.Minn. Mar. 9, 2001) (Kyle, J.) (citing *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 627 (Minn.1982)). In some circumstances, however, an employer's personnel handbook may alter the at-will status

of an employee to create a binding, unilateral contact between the employer and the employee. *Id.* (citing *Pine River,* 333 N.W.2d at 627).

18. For the first time in his memorandum in opposition to summary judgment, St. Hilaire raises hostile work environment and discrimination claims under Title VII, 42 U.S.C. § 2000e–2(m). (Pl.'s Mem. in Opp'n at 21–

## Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment (Doc. 8) is **GRANTED**.
2. Plaintiff's Complaint (Doc. 1) is **DISMISSED WITH PREJUDICE**.
3. Defendant's Motion for Rule 11 Sanctions (Doc. 13) is **CONTINUED UNDER ADVISEMENT**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

---

25.) Even if St. Hilaire could raise these claims at this time, which he cannot because he has not requested leave to amend and the time to amend set by the Rule 26(f) Report has passed, these claims would fail because the Court has already found that his hostile work environment claim has no basis, *see supra* Part I.C., and because Title VII does not apply to St. Hilaire's disability discrimination case, *see* 42 U.S.C. § 2000e–2(m) (an unlawful employment practice is established when the complaining party demonstrates that *race, color, religion, sex, or national origin* was a motivating factor for any employment practice) *(emphasis added)*.