# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3052

_____

Diane M. Cossette,                              *
                                                *
    Plaintiff - Appellant,              *
                                                *
v.                                              *   Appeal from the United States
                                                *   District Court for the
Minnesota Power & Light, an employer            *   District of Minnesota.
and business corporation in the State of        *
Minnesota; Joseph C. Burton,                    *
                                                *
    Defendants - Appellees.             *

_____

Submitted:  May 12, 1999

Filed: August 17, 1999

_____

Before RICHARD S. ARNOLD, JOHN R. GIBSON, and BOWMAN, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Diane M. Cossette appeals from the district court's entry of summary judgment on her claims of retaliation and illegal disclosure of confidential medical information under the Americans with Disabilities Act, as well as the court's dismissal of various related state law claims. We affirm the grant of summary judgment on the retaliation claim, but we reverse the summary judgment entered on the claims of illegal disclosure of medical information, as well as the dismissal of the state law claims, and we remand the case for further proceedings consistent with this opinion.

We view the evidence in the light most favorable to Cossette, the party against whom summary judgment was granted. See Do v. Wal-Mart Stores, 162 F.3d 1010, 1012 (8th Cir. 1998). In 1990, Cossette worked part-time for both Minnesota Power & Light and part-time as a waitress at a restaurant. While working at the restaurant, she fell and injured her back, leading to a finding of 10.5 percent permanent partial disability and entitling her to partial workers' compensation benefits under Minnesota law. Although her back injury substantially impaired her ability to lift, bend and carry, Cossette was able to continue her employment with MP&L in the "Call Center."

Three years after the back injury, Cossette still worked in the Call Center. Despite satisfactory job performance, Cossette's supervisor suspected that she suffered from literacy deficits, dyslexia, and perhaps other intellectual deficiencies, and she ordered Cossette to undergo testing at a local university clinic. The testing revealed normal cognitive and academic abilities.

In the meantime, Cossette was seeking a transfer from the Call Center to MP&L's Office Services Department. MP&L hired a local clinic to determine Cossette's ability to meet the physical demands associated with the office services clerk position. In November 1992, the clinic determined that Cossette had a lifting restriction of twenty to thirty-five pounds. Joseph C. Burton, supervisor of the Office Services Department, learned of Cossette's back injury, lifting restriction, and perceived intellectual deficiencies. At the behest of MP&L's associate general counsel and human resources officer and without Cossette's consent, Burton disclosed this information to his subordinates (Cossette's prospective co-workers). Burton and others were concerned that Cossette's limitations would adversely affect departmental morale, particularly if his subordinates' schedules and tasks would have to be altered to accommodate Cossette.

Burton and MP&L ultimately approved the transfer to the Office Services Department, where Cossette began working part-time in April 1993. Cossette

continued to receive favorable performance appraisals, but her co-workers treated her patronizingly as a result of Burton's unauthorized disclosures.

About one year later, the U.S. Postal Service considered hiring Cossette as a part-time letter carrier in the Duluth area. Cossette had previously scored well on the written examination required of applicants for the position, but local hiring freezes prevented the Postal Service from considering Cossette's application until the spring of 1994. The position required the ability to lift loads of up to seventy pounds.

Burton learned about Cossette's application to the Postal Service. Without Cossette's consent, he informed the Postal Service about Cossette's back injury and lifting restriction, reasoning that it was his "duty to inform the Post Office that [she] had a back injury," and that "it seemed important that the Postal Service should know" about the lifting restriction. Burton also admitted that he hoped "for his own greedy purposes" that Cossette would not get the letter carrier job and leave MP&L. The Postal Service declined to hire Cossette for the position, and it so informed her by letter on April 22, 1994. Some three weeks later, a letter carrier informed Cossette that an unfavorable reference from MP&L had led to the rejection of her application. As a result of Burton's disclosure and the rejection of her application, Cossette became severely depressed and underwent a course of psychotherapy and medication.

Cossette filed charges of disability discrimination with the Equal Employment Opportunity Commission against both MP&L and the Postal Service. Six weeks after she filed charges with the EEOC, Cossette received an unfavorable work performance appraisal from Burton and MP&L. Her previous evaluations were favorable, but the appraisal of September 1994 criticized her honesty, trustworthiness, general work performance, and "teamwork." Burton later revised the performance appraisal by removing some of the more negative remarks, but Cossette remained distressed by the incident. Cossette thereafter filed another charge with the EEOC, alleging that MP&L issued the unfavorable performance appraisal in retaliation for Cossette's initial charge of disability discrimination.

Cossette reached a settlement the next year with the Postal Service, which agreed to hire her as a letter carrier on the condition that she pass a driver's examination, a drug test, and a medical examination. She began work as a letter carrier in October 1995, working longer hours and earning a higher wage than at MP&L.

After receiving the necessary right-to-sue letters from the EEOC, Cossette commenced this action in the district court against MP&L and Burton. Her nine claims were essentially threefold. First, Cossette alleged that MP&L and Burton disclosed confidential medical information about her to her co-workers at MP&L as well as to the Postal Service in violation of the ADA, and that the latter disclosure delayed her employment with the Postal Service by fifteen months. Second, she charged that the negative performance evaluation was a reprisal directed against her for filing the initial disability discrimination charge. Third, she pursued various state law claims, including disability and retaliation discrimination under the Minnesota Human Rights Act, interference with prospective advantage, and negligent infliction of emotional distress.[1] In an oral ruling, the district court granted MP&L's motion for summary judgment, but its written judgment did not dispose of Count 8 of Cossette's amended complaint, which premised an ADA claim upon Burton's disclosures to Cossette's prospective co-workers in the Office Services Department. The district court then declined to exercise supplemental jurisdiction over Cossette's state law claims, which it dismissed without prejudice.

Cossette appealed. Because the district court did not dispose of Count 8, it did not issue a final judgment, and we dismissed for want of jurisdiction. See Cossette v. Minnesota Power & Light, 149 F.3d 1186 (table), No. 97-2813, 1998 WL 237247 (8th Cir. May 13, 1998). The district court thereafter granted summary judgment in favor of MP&L and Burton with respect to Count 8, and this appeal followed. We now

---

[1]Cossette's amended complaint also included a claim for negligent training, which counsel voluntarily dismissed.

affirm the district court's grant of summary judgment with respect to Cossette's retaliation claim, but we reverse the grant of summary judgment with respect to the illegal disclosure claims, as well as the district court's dismissal of Cossette's state law claims, and we remand the case for further proceedings consistent with this opinion.

## I.

The ADA limits the scope of information that employers may seek and disclose about their employees' medical condition. See 42 U.S.C. § 12112(d) (1994). Subsection 12112(d)(3) permits employers to require a medical examination of a prospective employee only after an offer of employment has been made, and it permits them to condition a final offer of employment upon the results of the examination only under certain circumstances, including the condition that any information obtained be "treated as a confidential medical record."[2]  Subsection 12112(d)(4), meanwhile, prohibits employers from requiring current employees to undergo medical examinations absent a showing of job-relatedness and business necessity, generally allows employers to conduct voluntary medical examinations, and requires (by reference) that the results of such examinations be kept confidential.[3] Cossette's complaint sets out two alleged

_____

[2]Subsection 12112(d)(3) carves out three exceptions under which employers need not maintain the confidentiality of employees' medical information, and subsection 12112(d)(4) incorporates these exceptions by reference.  MP&L does not invoke any of these exceptions, so we need not determine whether they apply.

[3]42 U.S.C. § 12112(d)(3)-(4) states:
(3) Employment entrance examination
A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if--
    (A) all entering employees are subjected to such an examination regardless of disability;

violations of section 12112(d)(3) and (d)(4): first, Burton's disclosure of Cossette's back injury and lifting restriction to the U.S. Postal Service when Cossette sought employment there, and second, his disclosure of the back injury and Cossette's perceived mental deficiencies to his subordinates when Cossette sought a transfer to his department. We address each claim in turn.

### A.

Viewed in the light most favorable to Cossette, the evidence shows that (i) she underwent a medical examination before transferring to Burton's department, and the examination confirmed her pre-existing back injury and lifting restriction, (ii) Burton

---

(B) information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, [subject to three exceptions not relevant here],. . .; and
(C) the results of such examination are used only in accordance with this subchapter.

(4) Examination and inquiry
(A) Prohibited examinations and inquiries
A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.
(B) Acceptable examinations and inquiries
A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.
(C) Requirement
Information obtained under subparagraph (B) regarding the medical condition or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3).

discovered that she was seeking a position at the U.S. Postal Service, and he disclosed Cossette's back injury and lifting restriction to her prospective employer, and (iii) because of Burton's disclosure, Cossette's hiring by the Postal Service was delayed by some fifteen months, resulting in some $19,500 in lost wages. We hold that these facts establish a submissible case of illegal disclosure of confidential medical information under 42 U.S.C. §§ 12112(d)(3)-(4).

**1.**

The district court held, and the defendants argue, that Cossette cannot recover under the relevant provision of the ADA because she is not disabled within the meaning of the Act. The court also held that disclosures such as Burton's "would not implicate the ADA." We disagree and hold that whether or not Cossette is disabled, the ADA protects her from unauthorized disclosures of medical information by her employer.

We turn first to the statutory language for guidance on this question of first impression in our circuit. The plain language of subsections (d)(3) and (d)(4) speaks of "employees" and "applicants"--suggesting that Cossette need not be disabled in order to recover. This language stands in stark contrast to the ADA's general prohibition of disability discrimination, which provides that employers shall not "discriminate against a qualified individual with a disability." 42 U.S.C. § 12112(a) (1994). Although subsection (d)(1) provides that subsection (a)'s general prohibition against discrimination shall include discrimination on the basis of medical examinations and inquiries, that provision is only one of several protections afforded by subsection (d), and it is only discrimination itself (and not illegal disclosure) that requires a showing of disability. See Fredenburg v. Contra Costa County Dep't of Health Servs., 172 F.3d 1176, 1182 (9th Cir. 1999).

Second, a contrary reading of subsections (d)(3) and (d)(4) would obliterate much of their usefulness. "It makes little sense to require an employee to demonstrate

that he has a disability to prevent his employer from inquiring as to whether or not he has a disability." Griffin v. Steeltek, Inc., 160 F.3d 591, 594 (10th Cir. 1998) (quoting Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1229 (10th Cir. 1997)), cert. denied, ___ U.S. ___, 119 S. Ct. 1455 (1999); see also Fredenburg, 172 F.3d at 1182.

Third and most importantly, we are persuaded by the holdings of the Ninth and Tenth Circuits that a plaintiff need not be disabled to state a claim for the unauthorized gathering or disclosure of confidential medical information. See Fredenburg, 172 F.3d at 1181-82; Griffin, 160 F.3d at 593-94 (subsection (d)(2)); Roe, 124 F.3d at 1229 (subsection (d)(4)). MP&L and Burton do not cite any contrary authority, and our own research reveals none at the circuit level.[4]

**2.**

That Cossette need not be disabled does not end the inquiry, for she must also establish that MP&L and Burton's violation of the ADA caused some sort of tangible injury. See Griffin, 160 F.3d at 594-95; Armstrong v. Turner Indus., Inc., 141 F.3d 554, 562 (5th Cir. 1998) (assuming without deciding that non-disabled plaintiff may proceed under subsection (d)(2), applicant must show "some cognizable injury in fact of which the violation is a legal and proximate cause for damages to arise from a single violation."). In ruling on a motion for summary judgment, we must view the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from the evidence. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Luigino's, Inc. v. Stouffer Corp., 170

---

[4]In addition to the district court in the present case, at least one other district court within our circuit has taken a contrary position. See Adler v. I & M Rail Link, L.L.C., 13 F. Supp. 2d 912, 935-37 (N.D. Iowa 1998). We are not persuaded by the reasoning in Adler.

F.3d 827, 830 (8th Cir. 1999).  Further, we may not weigh evidence or make credibility determinations.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

MP&L and Burton argue that Burton's statements did not cause the Postal Service to pass over Cossette in the hiring process.  They direct us to the deposition of Jeffrey Lien, a manager in the Postal Service who determined which applicants would be selected for the Duluth letter carrier positions.  Lien testified that he made the decision to reject Cossette's application but that he did so without any knowledge of the substance of Burton's disclosure, which was made to Margaret Campbell, a different employee within the Postal Service.  Although it was Lien who directed Campbell to ask Burton about Cossette's work history, Lien stated that he had already decided not to hire Cossette at the time that Campbell informed him of the substance of Burton's reference -- including Cossette's back injury and lifting restriction.  Cossette refutes the defendants' claim with circumstantial evidence:  Burton disclosed the information, the Postal Service declined to hire her even though she had tested better than or equally to nine of the thirteen individuals that were hired, and Loren Kuhnly (a letter carrier within the Postal Service) told Cossette that the evaluation from MP&L had sunk her application and that Lien had described the evaluation as "controversial."  This evidence, we believe, creates an issue of material fact with respect to whether Burton's disclosure caused the Postal Service's adverse hiring decision.  Whether to believe Cossette's evidence over Lien's testimony and whether to infer that Burton's reference doomed her application are determinations that rest with the jury.

**3.**

The Postal Service's own seventy-pound lifting requirement presents a more serious obstacle to recovery.  If Cossette could only lift twenty to thirty-five pounds and if a letter carrier must lift seventy pounds, then she seemingly could not have obtained a job as a letter carrier--with or without Burton's illegal disclosure.

-9-

Presumably, had Burton not disclosed Cossette's back injury and lifting restriction, the Postal Service would have discovered these during the course of a post-offer medical examination that it requires of all successful letter carrier applicants.

Despite this apparent difficulty with Cossette's claim, we believe that summary judgment is inappropriate under these facts. The lifting restriction of twenty to thirty-five pounds was imposed upon Cossette in November 1992 after MP&L compelled her to undergo an examination. The Postal Service rejected her application in April 1994.[5] In August 1995, Cossette underwent an additional functional capacity evaluation at the Isernhagen Clinic in Duluth. The evaluation revealed that Cossette "meets or exceeds the functional requirements" for a letter carrier position, and that she would not need any accommodations. She began working as a letter carrier in October 1995.

The evidence compels the inference that at some point between November 1992 and August 1995, Cossette became physically able to perform the tasks required of a letter carrier. There is no direct evidence that proves exactly when this occurred, and the record does not establish that Cossette would have failed a Postal Service medical evaluation in April 1994, when she was first rejected for the letter carrier position. For instance, evidence in the record indicates that Cossette had performed back strengthening exercises for three years prior to the August 1995 examination, and that she told a physician in July 1995 that she had experienced no symptoms or problems with pain in the last two or three years. Appellees concede as much, as they argue in their brief that Cossette was not disabled within the meaning of the ADA because her back injury and lifting restriction were fleeting. See Appellees' Br. at 13-14 ("As it happened, when she received a job offer from the Postal Service which required abilities beyond her 20-35 pound lifting restriction, Cossette simply went to the doctor and had the restriction removed. . . . The record shows the impairment was temporary.

---

[5]This occurred after Burton disclosed the back injury and lifting restriction, and we discussed above the conflicting evidence on this issue.

-10-

. . . Cossette is claiming she was qualified to be a letter carrier (i.e. unrestricted) as early as July 23, 1994.  How much earlier she had, in fact, returned to an unrestricted status we don't know.  The 20-35 pound lifting restrictions, if they were ever valid, were only temporary.").

As we stated above, we must view the evidence in the light most favorable to the party opposing the motion for summary judgment, and we must give that party the benefit of all reasonable inference to be drawn from the evidence.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Luigino's, Inc. v. Stouffer Corp., 170 F.3d 827, 830 (8th Cir. 1999).  If Cossette's lifting restriction was as trivial and temporary as MP&L and Burton argue, then a reasonable factfinder could infer that Cossette could have performed a letter carrier's job in April 1994.  On summary judgment we must give Cossette the benefit of that inference, and we therefore reverse the grant of summary judgment in MP&L and Burton's favor.

**B.**

While Cossette states a viable ADA claim arising from Burton's disclosure of the back injury and lifting restriction to the Postal Service, the claim arising from Burton's telling his subordinates about Cossette's back problem and perceived intellectual deficiencies is more problematic.  Burton made these latter disclosures to Cossette's prospective co-workers just before Cossette's transfer to the Office Services Department.  As a result, Cossette's co-workers treated her in a condescending and patronizing fashion.

As we explained above, Cossette must establish a tangible injury caused by the alleged illegal disclosure.  See Griffin v. Steeltek, Inc., 160 F.3d 591, 594-95 (10th Cir. 1998); Armstrong v. Turner Indus., Inc., 141 F.3d 554, 562 (5th Cir. 1998).  Cossette's claimed injury of being treated in a condescending and patronizing manner falls short of an "adverse employment action" that would be required to establish a prima facie

case of disability discrimination under 42 U.S.C. § 12112(a).[6]   The parties have not briefed whether such treatment suffices to create a claim of illegal disclosure of medical information under subsection 12112(d).   We reverse the district court's grant of summary judgment relating to Cossette's claim that Burton illegally disclosed confidential medical information about Cossette to his subordinates in the Office Services Department, so that this issue may first be considered by the district court.

## II.

Cossette next appeals the district court's adverse grant of summary judgment on her retaliation claim.   We conclude that summary judgment was properly granted.

The ADA prohibits retaliation against a person who files a charge of discrimination against an employer.   See 42 U.S.C. § 12203(a) (1994).   Retaliation claims under the ADA are analyzed identically to those brought under Title VII.   See Penny v. United Parcel Serv., 128 F.3d 408, 417 (6th Cir. 1997).   A prima facie case of retaliation consists of three elements:  (i) protected activity, (ii) adverse action taken by the employer against the employee, and (iii) a causal link between the two.   See Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc), pet'n for cert. filed, 67 U.S.L.W. 3758 (U.S. June 2, 1999) (No. 98-1938).   Proof of an adverse employment action requires a "tangible change in duties or working conditions that constitute[] a material employment disadvantage."   Manning v. Metropolitan Life Ins. Co., 127 F.3d 686, 692 (8th Cir. 1997).

---

[6]See Buckles v. First Data Resources, Inc., 176 F.3d 1098, 1100 (8th Cir. 1999) (prima facie case of disability discrimination includes showing that plaintiff suffered adverse employment action because of disability); Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997) (loss of status and prestige, in Title VII context, held not to constitute "adverse employment action" when salary and position remain the same); Scusa v. Nestle U.S.A. Co., ___ F.3d ___, No. 98-2866, 1999 WL 415439, at *8 (8th Cir. June 23, 1999) (shunning by co-workers held not to establish "adverse employment action" in Title VII retaliation case).

Cossette argues that she established a prima facie case of retaliation because MP&L issued an unfavorable performance evaluation six weeks after she filed a charge with the EEOC. The negative evaluation impugned Cossette's honesty and teamwork. MP&L argues that Cossette's negative evaluation resulted not from the charge filed with the EEOC, but rather from an incident in which Cossette lied to a co-worker by telling her that other co-workers hoped that she would not attend an annual Christmas party to be hosted by Burton. The co-worker became "quiet and withdrawn," and Burton concluded that Cossette's actions had harmed employees' morale within the department.

We conclude that Cossette has failed to establish a prima facie case of retaliation. Although the temporal link between the EEOC charge and the negative evaluation could create an inference of retaliation, see Mathews v. Trilogy Communications, Inc., 143 F.3d 1160, 1166 (8th Cir. 1998) (time lapse of two months between protected activity and discharge may create inference of retaliatory motive in ERISA context), the negative evaluation does not by itself constitute an adverse employment action within the ADA's contemplation. Without more, the evaluation does not amount to a "tangible change in duties or working conditions." See Manning, 127 F.3d at 692. At most, the evaluation resulted in a loss of status or prestige without any material change in Cossette's salary, position, or duties. See Ledergerber v. Stangler, 122 F.3d 1142, 1144-45 (8th Cir. 1997). Cossette's retaliation claim therefore fails, and the defendants were properly granted summary judgment.

## III.

Finally, Cossette appeals the district court's dismissal of her pendent state law claims. The district court dismissed the state law claims without prejudice after granting summary judgment to MP&L on the ADA claims.

A district court may exercise supplemental jurisdiction over state law claims that

arise from the same nucleus of operative fact as the plaintiff's federal claims and when the plaintiff would ordinarily be expected to try all the claims in one judicial proceeding. See Kansas Pub. Employees Retirement Syst. v. Reimer & Koger Assocs., Inc., 77 F.3d 1063, 1067 (8th Cir.), cert. denied, 519 U.S. 948 (1996). Although pendent jurisdiction rests within the district court's discretion, that discretion should be guided by considerations of judicial economy, convenience, and fairness to the litigants. See Hess v. St. Joseph Police Pension Fund, 788 F.2d 1344, 1346 (8th Cir. 1986).

In this case, the court predicated its dismissal of Cossette's state law claims upon the assumption that none of her federal claims were viable. Because we have reinstated two of Cossette's ADA claims -- Burton's illegal disclosure of medical information to his subordinates and to the U.S. Postal Service -- the district court may wish to reconsider whether to entertain Cossette's state law claims. We therefore reverse the court's dismissal of those claims so that it can consider them anew.

## IV.

For the foregoing reasons, the judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-14-